**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| CHASING ACES GOLF, INC. | CIVIL ACTION NO. 26-2627 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| QCADDY INTERNATIONAL B.V. | MAGISTRATE JUDGE HORNSBY |

# MEMORANDUM RULING

Before the Court is a motion to compel arbitration, Record Document 9, filed by the defendant, QCaddy International B.V. ("QCaddy"), under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") implemented by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201, *et seq*. For the following reasons, the motion to compel arbitration, Record Document 9, is **GRANTED**, and this matter is **STAYED** and **ADMINISTRATIVELY CLOSED** until resolution of the arbitration proceedings.

## Background

In February 2024, Chasing Aces Golf, Inc. ("Chasing Aces"), a Delaware corporation, began construction and development of "a modern golf and entertainment complex in Bossier City, Louisiana." Record Document 1-1 at 2. During development, Chasing Aces and QCaddy, a Dutch technology company, negotiated the purchase of a QCaddy product called "QTee." *Id.* QTee was an "automated hole-in-one recording system" that, according to Chasing Aces, QCaddy

"represented as a commercially mature, 'plug-and-play' product suitable for immediate deployment." *Id.*

Several months after their negotiations began, Chasing Aces and QCaddy arranged for a demonstration of QTee at Chasing Aces' facility. *Id.* On September 23, 2024, a QCaddy executive told a Chasing Aces executive that "we have to get the contract signed urgently. This hold up will delay the demo date[.]" Record Document 13-1 at 6. No later than September 24, 2024, Chasing Aces and QCaddy signed a Purchase and Service Agreement ("Purchase Agreement"). Record Document 1-1 at 8, 46. The parties also executed two appendices that related to proposed maintenance services and terms of the on-site QTee demonstration. *Id.* at 47-51.

The Purchase Agreement consisted of eight pages and seven articles. *See generally* Record Document 1-1 at 39-46. The seventh and final article, titled Jurisdiction, included two subsections. *Id.* at 45. Section 7.1, named "Applicable Law," stated: "This Agreement is construed in accordance with and subject to the laws of the Netherlands. The United Nations Convention on Contracts for the International Sale of Goods (Vienna, 1980) (CISG) is included." *Id.* Relevant here, Section 7.2 was titled "Dispute Resolution" and provided:

> "Any dispute following from or in relation to this Agreement, shall be settled exclusively in accordance with the NAI Arbitration Rules and the Parties or, as the case may be, the first party to take action, shall submit the dispute to the Netherlands Arbitration Institute for arbitration in accordance with the Arbitration Rules of the Netherlands Arbitration Institute. The arbitral tribunal shall consist of one (1) arbitrator. The arbitral tribunal will be appointed according to the list procedure. The place of

> arbitration will be Roterdam [sic] and the proceedings will be conducted in the Dutch language.

*Id.* at 45-46.

After execution of the Purchase Agreement, in November 2024, QCaddy demonstrated QTee for Chasing Aces. Record Document 1-1 at 3. The parties dispute how well QTee performed. Chasing Aces alleged that the demonstration "revealed significant deficiencies in both functionality and development maturity." *Id.* Chasing Aces also pleaded that QTee's "system interface was incomplete and lacked a functional endpoint for reliably recording, verifying, or exporting hole-in-one events." *Id.* at 4. Chasing Aces asserted that its executives were not satisfied with the demonstration and "elected to orally terminate the [Purchase] Agreement." *Id.* at 5. QCaddy saw things differently. According to QCaddy, the demonstration was a success, which a Chasing Aces executive confirmed in writing, and Chasing Aces never terminated the Purchase Agreement. *See* Record Document 14 at 1-2 n.1.

QCaddy later sent a demand letter to Chasing Aces for damages from alleged breach of the Purchase Agreement. Record Document 1-1 at 6. The demand letter also notified Chasing Aces that QCaddy would file for arbitration in the Netherlands pursuant to the dispute resolution article of their contract. *Id.* After some back and forth, Chasing Aces filed a lawsuit in Louisiana state court against QCaddy. *See generally id.* In its petition, Chasing Aces sought a judgment declaring that QCaddy had no rights to assert under the Purchase Agreement. *See* Record Document 1-1 at 9-13.

Chasing Aces articulated three counts. First, Chasing Aces alleged that the Purchase Agreement "never formed" because its consent had been vitiated through fraud. Record Document 1-1 at 9. Chasing Aces pleaded that QCaddy made false or misleading statements that QTee "was a finished, commercially mature, 'plug-and-play' product…." *Id.* It based that accusation on "the deficient on-site demonstration, the prototype-level condition of the system, the absence of functional software endpoints, and QCaddy's inability to demonstrate real-world performance under normal operating conditions." *Id.* Second, in the alternative, Chasing Aces alleged that it terminated the Purchase Agreement "following the deficient demonstration" pursuant to one of its terms, which stated that "[t]he parties agree that if the demo…fails to function properly, Chasing Aces shall have the right to terminate the [Purchase] Agreement without needing to pay any form of compensation or payment to QCaddy." *Id.* at 11, 43.

Third, and relevant here, Chasing Aces requested a declaration "that the forum selection and arbitration clause is unenforceable as contrary to Louisiana public policy," *id.* at 12, based on five theories:

> (1) The forum selection and arbitration clause was contained in a pre-printed agreement drafted entirely by QCaddy, presented to Chasing Aces on an urgent basis as a precondition to scheduling the demonstration, and provided Chasing Aces no meaningful opportunity to negotiate its terms;
>
> (2) The fundamentally one-sided and oppressive nature of the clause, which would compel a Louisiana business to arbitrate in the Netherlands a dispute arising entirely from events that occurred in Louisiana;

(3) The substantial deprivation of Chasing Aces' ability to seek meaningful relief, where all material performance, witnesses, evidence, and operative facts are located in Bossier Parish, Louisiana, and where enforcement would impose prohibitive costs and logistical burdens on Chasing Aces while benefiting QCaddy;

(4) The Agreement contains no provisions authorizing recovery of liquidated damages, lost profits, or speculative future revenues. Compelling arbitration in the Netherlands would facilitate QCaddy's pursuit of remedies that are neither authorized by the contract nor recognized under Louisiana law, in violation of Louisiana's strong public policy against penalties and unenforceable speculative damages claims; and

(5) Enforcement of the clause under these circumstances would be unreasonable, unjust and contrary to Louisiana's strong public policy favoring access to its courts for disputes arising within Louisiana and involving Louisiana businesses.

In response to Chasing Aces' lawsuit, QCaddy removed the action to this Court and moved to compel arbitration. Record Documents 1, 9.

**Analysis**

The Convention governs the enforcement of arbitration agreements between citizens of member nations. *Sedco, Inc. v. Petroleos Mexicanos*, 767 F.2d 1140, 1145 (5th Cir. 1985). The purpose is to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). The FAA implements the Convention and provides for enforcement in federal courts. *See* 9 U.S.C. §§ 201-208

Federal courts "conduct only a very limited inquiry" when deciding whether to compel arbitration under the Convention. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 339 (5th Cir. 2004). Arbitration is required "if (1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Id.*

That limited inquiry narrows even further when the parties agree to arbitrate arbitrability. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). The United States Supreme Court has explained that "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 68. However, federal courts cannot "assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up).

In *Petrofac, Inc. v. DynMcDermott Petrol. Operations Co.*, the United States Court of Appeals for the Fifth Circuit held that "the express adoption of American Arbitration Association [("AAA")] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." 687 F.3d 671, 675 (5th Cir. 2012). The Fifth Circuit reached that conclusion because the AAA rules stated that "the arbitrator shall have the power to rule on his or her own jurisdiction[.]" *Id.* In their agreement, the parties had "agreed that the arbitration would be conducted by the [AAA] under its Construction Industry Arbitration Rules…." *Id.* at 674.

Chasing Aces and QCaddy agreed to arbitrate arbitrability. As one district court explained, "[w]hen an arbitration agreement incorporates by reference rules which give the arbitrator the power to rule on arbitration jurisdiction, the parties incorporation of those rules evidences a clear and unmistakable intent to delegate the determination of arbitrability to an arbitrator." *Halliburton Energy Servs., Inc. v. BJ Servs. Co.*, No. 08-475, 2010 WL 2991031, at *3 (E.D. Tex. July 28, 2010). Here, Chasing Aces and QCaddy expressly adopted the arbitration rules of the Netherlands Arbitration Institute ("NAI") in the Purchase Agreement. The parties agreed that "[a]ny dispute following from or in relation to this [Purchase] Agreement, shall be settled exclusively in accordance with the NAI Arbitration Rules." Record Document 1-1 at 45. The NAI Arbitration Rules, in turn, vest their arbitrators with the power to determine their jurisdiction. *See, e.g.*, Record Document 9-2 at 16 ("[T]he arbitral tribunal decides on pleas contesting its jurisdiction."). Therefore, the Court finds that Chasing Aces and QCaddy delegated the "gateway disputes" of arbitration to the NAI arbitrator. *Cooper v. WestEnd Cap. Mgmt., L.L.C.*, 832 F.3d 534, 545 (5th Cir. 2016).

When the parties have agreed to arbitrate arbitrability, "a party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole." *Hill v. Jackson Offshore Holdings, L.L.C.*, 175 F.4th 324, 332 (5th Cir. 2026). An arbitration clause that is "null and void" cannot be enforced. *See Freudensprung*, 379 F.3d at 339. The null and void exception is limited to contractual defenses "that can be applied neutrally on an international scale" like

"fraud, mistake, duress, and waiver." *Bautista v. Star Cruises*, 396 F.3d 1289, 1302 (11th Cir. 2005).

In this case, Chasing Aces challenged the arbitration clause in count three of its petition and articulated several theories for declaring it null and void. Record Document 1-1 at 12-13. Curiously, though, Chasing Aces did not raise these claims again in its opposition to QCaddy's motion to compel arbitration. *See generally* Record Document 13. And although insisting that it did not abandon these claims, Chasing Aces also did not provide any legal authority to support these theories. *See, e.g.*, Record Document 15-1 at 5. Whether abandoned or not, as explained below, none of Chasing Aces' claims have merit.

Chasing Aces raised unconscionability and adhesion claims against the arbitration clause, saying it was "contained in a pre-printed agreement drafted entirely by QCaddy, presented to Chasing Aces on an urgent basis as a precondition to scheduling the demonstration, and provided Chasing Aces no meaningful opportunity to negotiate its terms." Record Document 1-1 at 13. Similarly, Chasing Aces said that it would be unfair for it to arbitrate in the Netherlands when it is a Louisiana business, the dispute arose from events in Louisiana, and enforcement of the clause would "impose prohibitive costs and logistical burdens." *Id.*

Other district courts have rejected similar arguments. *See, e.g.*, *Spanish Villa, LLC v. Certain Underwriters at Lloyd's London*, 728 F. Supp. 3d 359, 366-67 (E.D. La. 2024) (holding arbitration clause not unconscionable despite the expenses required for arbitrating in another state and rejecting adhesion claim where the

clause applied equally to both parties, was written in the same text, and had been offset with a bolded font and title); *Georgetown Homeowners Assoc., Inc. v. Certain Underwriters at Lloyd's London*, No. 20-102, 2021 WL 359735, at *13 (M.D. La. Feb. 2, 2021) (rejecting adhesion argument where the arbitration clause had been bolded and offset with a header in a font equal to the rest of the document, applied equally to both parties, and the parties had similar bargaining strength).

The arbitration clause here is not unconscionable. Federal courts regularly enforce clauses that require arbitration in an international forum, even though they impose a financial and logistical burden on a party. *See, e.g.*, *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 906 (5th Cir. 2005) (enforcing arbitration in the Philippines). Although arbitration in the Netherlands is inconvenient for Chasing Aces, that is true of all arbitrations for American companies in foreign nations under the Convention.

Moreover, the arbitration clause is not a contract of adhesion. The clause itself was in the same font as the rest of the eight-page Purchase Agreement, sat immediately before the signature block, and was offset with a title and bolded font. Record Document 1-1 at 45-46. Chasing Aces claims it had no opportunity to negotiate the arbitration clause because of QCaddy's urgency to have the Purchase Agreement signed. Record Document 1-1 at 13. But that is not enough. Chasing Aces does not allege that QCaddy had superior bargaining power or that the demonstration, which created the urgency, could not have been rescheduled. Moreover, Chasing Aces could have sought removal of the arbitration clause during the months of negotiations with

QCaddy or even sought a different technology vendor. Instead, Chasing Aces chose to bind itself to arbitrate any dispute under the Purchase Agreement in the Netherlands. Therefore, the Court finds that the arbitration clause is not a contract of adhesion.

Chasing Aces' final claim is that arbitration in the Netherlands would permit QCaddy to pursue legal remedies not available in Louisiana. Record Document 1-1 at 13. That argument fails, though, because questions about "which law should apply to arbitration" are "beyond the scope" of a federal court's inquiry. *Charles House Condo. Assoc., Inc. v. Old Republic Union Ins. Co.*, No. 22-2513, 2023 WL 11876983, at *3 (E.D. La. June 5, 2023) (collecting cases). When considering whether to compel arbitration, the inquiry is "confined to determining the applicability of the Convention to the arbitration clause at issue." *Id.* Federal courts have "no authority" to "mandate the law to be applied in the future arbitration proceeding" much less declare the proceeding null based on speculation about what law might be applied. *See id.*

Chasing Aces focuses most of its petition and its opposition to the motion to compel arbitration on claims that QCaddy acted fraudulently. *See* Record Document 1-1 at 9-12; Record Document 13 at 12-19, 21-29. In short, Chasing Aces argues that QCaddy's allegedly fraudulent statements about the functionality of QTee vitiated its consent to enter into the Purchase Agreement. *See* Record Document 13 at 26. They argue further that because the Purchase Agreement should be "deemed never to have existed," the arbitration clause contained therein also did not exist. *See id.* at 26-27.

But this argument, by its own terms, attacks their entire agreement, not the arbitration clause specifically, and as such, it must be addressed by the arbitrator.

The Fifth Circuit rejected Chasing Aces' argument in *Hill*. 175 F.4th at 334. There, a seaman alleged that his consent to a wage agreement, which included an arbitration clause, was vitiated because the owner made fraudulent statements and that he signed it under economic duress. *Id.* at 328. The Fifth Circuit explained that challenging the contract as a whole "does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* at 332. It held that a "party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole." *Id.* at 332. Enforcing the arbitration clause, the Fifth Circuit reasoned that the seaman "did not specifically challenge the delegation clause itself." *Id.* at 333. Indeed, in rejecting his arguments, the Fifth Circuit explained that the seaman "must do more than simply argue 'that the contract as a whole (including its arbitration provision) is rendered invalid,' but he did not make any arguments beyond attacking the Agreement generally." *Id.* at 334.

So too here. Chasing Aces' arguments about alleged fraudulent statements attack the Purchase Agreement, not the arbitration clause. For example, Chasing Aces says that it "would not have signed the [Purchase] Agreement had it known of the poor performance of the product as shown at the demonstration. Clearly, QCaddy's misrepresentation of the product's quality was the only reason that Chasing Aces signed the [Purchase] Agreement, and this fraud vitiated Chasing Aces' consent[.]" Record Document 13 at 26. It made other similar arguments throughout

its voluminous briefing. *See, e.g.*, *id.* at 28 ("Article 7.2.1 does not exist independently of the purported Agreement; it is merely a provision within the instrument whose formation is disputed.").

These are precisely the arguments that *Hill* foreclosed, and Chasing Aces seemingly concedes that point, because it argues that the majority opinion of *Hill* should be ignored and the concurring opinion should be followed instead. *See id.* at 14 n.3, 26-27. District courts cannot ignore circuit court precedent, and this Court will not accept Chasing Aces' invitation to do so. *See, e.g.*, *Otkins v. Gilboy*, No. 21-1275, 2024 WL 1013916, at *2 (E.D. La. Mar. 8, 2024) ("It is central to our entire federal judicial system that federal district courts must faithfully apply binding circuit court and Supreme Court precedents.").

Chasing Aces did make a half-hearted attempt to label its fraud claims as a challenge to the arbitration clause. But it amounted to no more than one sentence: "if the Court determines that a contract was formed, and a delegation clause is present, Chasing Aces specifically challenges the delegation clause." Record Document 13 at 29. A label, however, is not enough. *Hill* rejected a similar attempt when the seaman "stated that he challenged 'both the entire Agreement, as well as the arbitration language or clause specifically.'" 175 F.4th at 334. The Fifth Circuit held that the seaman's "efforts to frame his challenge as directed at the delegation clause, without more, are insufficient." *Id.* Like the seaman in *Hill*, Chasing Aces did not explain how its challenge applied to the delegation clause specifically. For example, Chasing Aces did not allege that QCaddy misrepresented the NAI Arbitration Rules, concealed that

those rules allow the arbitrator to decide his own jurisdiction, or otherwise induced Chasing Aces to agree to the delegation clause. *See Hill*, 175 F.4th at 334. Chasing Aces cannot save its fraud claims by labeling them as a challenge to the delegation clause.

Because Chasing Aces' fraud claims attack the Purchase Agreement as a whole, and because the parties delegated questions of arbitrability to the arbitrator, the Court must compel arbitration. QCaddy asked the Court to compel arbitration and then either dismiss or stay this action. Record Document 9-1 at 5. The FAA states that courts "shall on application of one of the parties stay the trial of the action until such arbitration has been had." *Sedco*, 767 F.2d at 1146 (quoting 9 U.S.C. § 3). As such, this Court will stay the litigation until resolution of the arbitration proceeding.

**Conclusion**

For the foregoing reasons, the motion to compel arbitration, Record Document 9, filed by the defendant, QCaddy International B.V., is **GRANTED**. This matter is **STAYED** and **ADMINISTRATIVELY CLOSED** until resolution of the arbitration proceedings. An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**DONE AND SIGNED** at Shreveport, Louisiana, this 20th day of October, 2026.

ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE